Reed et al. vs. Roberts.

DANIEL REED, et al., plaintiffs in error, vs. WILLIE ROBERTS, defendant in error.

Where a testator makes his will *in extremis*, being feeble from age and disease, and is racked with bodily pain, to make the attestation sufficient, under the statute of frauds, the testator's position should be such as to enable him, without change of situation, to see the witness subscribe the will; to bring the *factum* of the attestation within the scope of his vision, by looking in that direction.

Caveat to will, in Gordon county; motion for new trial. Decided by Judge TRIPPE, April Term, 1858.

Jehu Nobbet made a will, dated 14th February, 1858, and appointed Willie Roberts and George H. Hogan executors and guardians of the property and children therein named. Nobbet died, and Willie Roberts, executor, propounded the will for probate, and George H. Hogan, Daniel S. Reid; et al , entered a caveat.

The case came on for trial, and much testimony was introduced in relation to the condition and *position* of the testator at the time of attestation; which testimony is sufficiently set out in the opinion of the Court.

Counsel for the caveators requested the Court to charge the jury, "that if the situation of the parties was such that the testator might have seen the attestation of the will, by the subscribing witnesses, by rising from his bed, it was not a good attestation; that he must have been able to have seen it in his *actual position*, at the time of attestation ;" which charge the Court gave to the jury, with the addition and qualification, "that if the testator might, by a slight effort, as by reaching out his hand and removing the counterpane and obstructions behind him, or by turning his head, shoulders and body in the bed, provided he was able to do so, have seen the witnesses subscribe and attest the will, it was a sufficient attestation, in his presence ; but if it required any considerable effort for the testator to have seen the witnesses subscribe and attest the will, it was not a good attestation." To all of which

addition and qualification to the charge requested, as given by the Court, counsel for caveators excepted, as well as to the refusal of the Court to give the charge as requested, without qualification or addition. The jury returned a verdict setting up the will.

The caveators then moved the Court for a new trial, on the following grounds, to-wit:

1st. Because the Court refused to charge the jury as requested, but did charge the same, with additions and qualifications as above set out in the charge of the Court.

2d. Because the jury, after having retired to their room to consider the case, during a recess of the Court for the night, sent their bailiff, without direction or knowledge of the Judge, for the 18th vol. Ga Rep's, and had the case of *Hall vs. Hall* read to them out of the same.

3d. Because one of the jurymen charged with this case, separated from the jury, and came out of the jury room into the Court room, during the recess of the Court for the night.

4th, 5th, 6th and 7th. Because the verdict was contrary to the law, against the evidence, and the weight of evidence.

The motion for a new trial was refused, and counsel for caveators excepted, and allege error on the charges of the Court, its refusal to charge as requested, and the refusal to grant a new trial.

DABNEY & AKIN, for plaintiffs in error.

WALKER & FRANCIS, for defendant in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

The issue in this case is, *devisavit vel non.* And the only question which we deem it necessary to discuss is, whether the will of John Nobbett was duly attested under the statute of frauds? The Act of 29 *Car.* 2, *c.* 3, requires that the attestation of the witnesses shall be *in the presence of the testator.* Was this provision complied with in this case?

The testator executed his will *in extremis.* He was very sick, and in great pain at the time, and died shortly afterwards. The bed upon which he lay had half stand-posts for curtains. There was a counterpane stretched across the head, to protect him from the air. Thus situated, he was raised up and supported, leaning on the shoulder of a friend, until he signed the will himself. It was then taken back of the head of the bed, to a chest, against the wall, some seven or eight feet distant, where it was attested by the subscribing witnesses. It is not pretended that he actually saw them. The weight of the testimony is, that he was unable, without help, to have changed his position, so as to have seen the witnesses subscribe. It is admitted that, by removing the curtain in the rear, and turning his head, or elevating his head above the level of the screen, and turning, or by being moved more toward the side of the bed, and turning his head and shoulders, so as to have looked around the post, he could have witnessed the attestation. Under this statement of facts, the Court was requested to charge the jury, "that if the situation of parties was such that the testator might have seen the attestation of the will by the subscribing witnesses, by rising from his bed, it was not a good attestation; that he must have been able to have seen it in his *actual position*, at the time of attestation." Which charge the Court gave to the jury, with the addition and qualification, "that if the testator might, by a slight effort, or by reaching out his hand and removing the counterpane and obstructions behind him, or by turning his head, shoulders and body in the bed, provided he was able to do so, have seen the witnesses subscribe and attest the will, it was a sufficient attestation, in his presence. But if it required any considerable effort for the testator to have seen the witnesses subscribe the will, it was not a good attestation."

The jury found a verdict in favor of the will, and counsel for the caveators moved the Court to set it aside and direct a new trial, mainly on the ground, that the instruction given

was a misdirection as to the law of the case.   The application being refused, a writ of error is prosecuted to this Court.

It cannot be denied that the Courts, both in England and in this country, from a disposition to favor wills, have departed, not only from the strict construction, but the obvious meaning, of the statute of frauds; and the result has been, to open the door to very extensive litigation.   *Shires vs. Glasscock*, 2 *Salk.* 688; *Davy vs. Smith*, 3 *ibid.* 395; *Longford vs. Eyre*, 1 *P. Wms.* 740; *Casson vs. Dade*, 1 *Bro. c. c.* 99; *Tod vs. Earl of Winchelsea*, 2 *Carr & Payne*, 488; *Broderick vs. Broderick*, 1 *P. Wms.* 239; *Doe vs. Manifold*, 1 *Maule & Selw*, 294; 12 *Common Law Rep.* 227; *Right vs. Price, Douglas*, 241; *Par. on Dev.* 90–97; *Roberts on Wills*, 163—67; *Longchamp vs. Fish.* 5 *Bos. & Pull.* 415; *Russell vs. Falls*, 3 *Harr. & McHen.* 457; *Edilen vs. Hardy*, 7 *Harr. & Johns.* 61.

But, notwithstanding Courts of Justice have thus leant strongly in favor of the validity of wills fairly made, and where there is no imputation of fraud, still there is a limit prescribed by positive law, beyond which we cannot go. The witnesses must subscribe in the presence of the testator, in some sense, or else the statute requiring this to be done, is judicially repealed.

The first case we have upon this subject, is that of *Shires vs. Glasscock*, *reported in* 2 *Salkel*, 688, *Carthw.* 81, *and* 1 *Equity Cases, abridged*, 403. It was decided in 3 *Jac.* 2, about eleven years after the making of the statute, and has ever since been considered a leading case, and is constantly referred to. Let us for a moment examine this case, and compare it with the one before us, and the doctrine contended for in support of this will.

Sir George Shires, being sick in bed, made his will, and signed it in the presence of three witnesses; but he, being very ill, the witnesses withdrew into a gallery, seven yards distant, between which and the chamber where the testator lay, there was a lobby, with glass doors, and the glass broken in

some places. Here the witnesses subscribed the will. It was proved that the testator, from the bed where he lay, might have seen the table in the gallery, on which the witness subscribed, through the lobby and the broken glass window. *Per Curiam*: "The statute required attesting in his presence, to prevent obtruding another will in the place of the true one; it is enough if the testator might see: it is not necessary that he should actually see them signing; for at that rate, if a man should but turn his back, or look off, it would vitiate the will. Here, the signing was in view of the testator. He might have seen it, and that was enough."

This, now, is the case, and the judgment of the Court upon it. But in pronouncing the decision, it is added: "So if the testator being sick, should be in bed and the curtain drawn." Let it be rembered that this latter point was not before the Court. That it was a bald *obiter dictum*.

Well, the next case that came up, is *Davy vs. Smith*, (3 *Salk.* 395,) in which the question was, whether the witnesses to a will had pursued the statute of frauds in subscribing their names; and it was resolved, that where the testator lay in a bed in one room, and the witnesses went through a a small passage into another room, and there set their names, at a table in the middle of the room, and opposite to the door, and both that and the door of the room where the testator lay were open, so that he might see them subscribe their names, if he would, though there was no positive proof that he did see them subscribe, yet that was a sufficient attestation, within the meaning of the statute, because the testator might have seen them subscribe. And therefore, *per Curiam:* "If the witnesses subscribe their names in the same room where the testator lies, though the curtains of the bed are drawn close, it is a good subscribing within the statute."

Here we have the bed-curtain *obliter* in the previous case, resolved to be law in this, with the word "*close*" superadded, which is not in the original case, upon a state of facts

Reed et al. vs. Roberts.

which did not at all justify it. And in this form the propo-
sition has passed into the elementary books, and is cited as
a precedent, namely: that signing in the room was signing
in the presence of the testator, though the testator be in bed
and the curtains closely drawn. And this illustration in
*Shires vs. Glasscock,* adopted as law in *Davy vs. Smith,* is
the foundation of all that class of cases which hold, that
where the testator had the capacity to witness the attestation,
by making some *little* effort, it was a sufficient compliance
with the statute.

Let us hear no more fault finding after this with *obiter
dicta.* Three-fourths of all the law in force in Christendom,
as can be demonstrated by reference to the English and Amer-
ican Reports, originated in the *obiter dicta* of Courts and
Judges. And this is no random remark, recklessly made, but
attested by an eminent Jurist, now occupying one of the
most elevated Judicial positions in the Union.

Well may it be regretted that this doctrine of the construc-
tive presence of the testator was ever carried so far. It has
not only, in the language of Chancellor Kent, " opened *the
door* to very extensive litigation," but lifted up a flood-gate,
through which a torrent is rushing, that threatens to sweep
away all the old landmarks of the law, upon the subject of
the execution of wills. And where will it stop? If any
change in the position of the testator is required, how much
or how little will do? Can any rule be prescribed? If the
attestation is sufficient, provided it could be seen by the tes-
tator, by drawing aside the surrounding curtains, or elevating
his head over the screen at his head, or by turning his head,
shoulders and body in the bed, why not, by changing the
position of his whole body from the right side to the left, or
even getting out of his bed? Nay, why stop at this? If
the testator's situation be such that he cannot see the sub-
scription by the witnesses, by the exertion of his own power
and volition, why should it not be sufficient to satisfy the
the requisition of the statute, according to this liberal and

latitudinous construction of it, if the testator might cause himself or the witnesses to be placed in such a situation as he might see their attestation?

*Presence*, is not defined in the statute. It is obviously not synonimous with being in the same room. A testator may see as accurately what is passing in another room, as if done in the same room. And on the contrary, he may be so situated as not to see what is transacting in the same room where he lies, and thus have a false paper surreptitiously executed as his will. The object of the law can only be effectuated when the testator is so situated, both as to the will and the witnesses, that he may, if he choose, see both, in the act of attestation. And it is wholly immaterial whether the attestation be in the same room or in a different room. The rule is the same as to both. The will and the witnesses must both be in the presence of the testator. He ought to be able, without an effort or change of position, to see both. Perhaps, it would be requiring too much to insist that it should be shown, that he did actually see both. Witnesses engaged in the act of subscribing their names, rarely watch to see if the testator at the same time is looking on. But it should appear, in the words of one of the cases, "that *he* was so *present* to *them*, and *they* to *him*, as that he *might* and probably *did* see the attestation." This we believe to be the sum and substance of the law, and the current of decisions; and that to go beyond this, is dangerous and mischievous. It will never do to hold, that because a testator may change his situation, or cause it to be done, or remove any intervening obstruction, (without doing either,) and that thereby he might have seen the attestation, it will suffice.

The will of a blind man is an exceptional case, and one not very well settled. We leave that to be decided when the case occurs.

Why a desire to favor the wills of testators made *in extremis*, should exist in this State, we do not very well understand. Ordinarily, our statute of distribution makes the

fairest disposition of a dead man's property.   Here, a man
advanced in life, weakened by disease, and racked with pain,
is supported in bed while he subscribes his will.    While
in the act of executing his will, by which he bequeathes an
estate of from $20,000 to 35,000 to the children by a second
marriage, he forgets the amount of the pittance with which
he cuts off the offspring of a former marriage, first saying,
when the will was read to him, that he thought he had left
to them $10 instead of $100, and then upon the second read-
ing, $5 instead of $10!   And yet, the salutary safeguards of
the statute of frauds are to be broken down and disregarded,
to set up such a will!   It is going quite far enough to say,
in such a case, that the law is satisfied by the testator being
in such a situation that he *may*, from that situation, and
without change of position, and without aid from others, su-
pervise the attestation.

In this case, after the testator signed, the witnesses retired
obliquely behind the head of the bed, with a counterpane
intervening between them and him.  It is not pretended that
he did see them attest the will.   It is clear that by casting
his eyes, as he lay, in any direction, the *factum* of the attes-
tation was not within the scope of his vision.   The prob-
ability from the proof is, that he could not have changed
his situation, from bodily infirmity and pain.   He was cer-
tainly not assisted to do so by others.   The attestation, there-
fore, being out of the scope of the testator's vision, becomes
bad, as not being in his presence.

It is complained that after the jury had been charged with
the cause, and retired to their room for consultation, and
had been occupied for several hours in the consideration of
the case, and the Court had retired for the night, they caused
their bailiff, without permission from the Court, or the knowl-
edge of the caveators or their counsel, to bring to their rooms
the 18th volume of Georgia Reports, and had H. F. Buch-
anan, one of their body, to read the case of *Hall vs. Hall,* in
the hearing of the jury.

This, to say the least of it, is an irregularity which ought not to be encouraged. If one book may be sent for, another may; and that, too, whether it was read on the trial or not. Of course, the case of *Hall vs. Hall* is good law, because found in our own Reports. Still, we see many objections to the allowance of this practice. If the presiding Judge mistake or misapply the law, the losing party has his remedy. But no exceptions can be filed, or writ of error prosecuted, to the erroneous interpretation of the law by the jury. It might, too, if sanctioned, afford to the Judge a very convenient mode of avoiding both trouble and responsibility, by simply handing over the authorities to the jury, and directing them to expound the law, as well as find the facts, for themselves.

We deem it unnecessary to notice the other points in the case. They have been waived in the argument.

Judgment reversed.