## HELMS v. THE STATE.

1. Threats made shortly before a homicide by a defendant to kill the sister of the deceased, to whom she immediately fled for protection, are admissible in evidence as part of the res gestæ of the whole transaction, and as showing the state of mind of the defendant toward the sister, about whom the killing occurred.

2. On the trial of one charged with murder, it was not error to allow a witness for the State to testify as to threats made by the accused about a week before the homicide, after having a difficulty with the sister of the deceased, with whom the accused lived; the killing having occurred at the home of the deceased, where the sister had fled for protection, the testimony complained of being as follows: "I think about a week before Good was killed, Loyd came up to my house one night, and I asked him where was Laura [the sister of deceased]. He said they had a fuss, he jumped on her and beat her, but that he reckoned she would be back to cook supper. And I said, 'If she don't come back, will you go after her?' And he said, 'I don't know, sir.' And I said, 'You had better stay away from over there.' And he said, 'If ever I do go after her and they don't let her come, I will kill somebody or get killed, one.'"

3. The charge complained of in the 6th ground of the motion, relative to the right of the deceased to defend his sister from an assault upon her by the accused, was not open to the objection that there was no evidence upon which to base it.

4. Where this court, on a former review of the case, held that the evidence did not authorize a charge on manslaughter, and where the evidence on the second trial was substantially the same as on the first, there was no error in omitting to charge on the law of manslaughter.

5, 6. On the trial of one charged with murder, an instruction given to the jury that "if, after investigating all the facts and circumstances in this case, you are satisfied by a preponderance of the testimony in the case, or if you have a reasonable doubt on that question, that the defendant was acting in self-defense, or against one who was manifestly intending by violence or surprise to commit a felony on his person, the defendant would be justifiable," is inaccurate and not applicable to a criminal case in its reference to a "preponderance of the testimony;" but this will not require a new trial, where the charge, taken as a whole, clearly shows that the judge correctly instructed the jury as to the rule applicable to the evidence in criminal cases.

7. Where the court gives in charge to the jury the principles of law with respect to the right of a slayer to kill in order to prevent the commission of a felony, the failure to define the term "felony," as used in such charge, in the absence of a request to give such definition, is not error requiring a new trial.

8. The verdict is amply supported by the evidence.

NOVEMBER 13, 1912.

Indictment for murder. Before Judge J. B. Park. Jasper superior court. September 18, 1912.

A. S. Thurman, for plaintiff in error. T. S. Felder, attorney-general, and J. E. Pottle, solicitor-general, contra.

HILL, J. 1. The fourth assignment of error was because the court admitted certain evidence of Laura Greer, a witness for the State, who was permitted to testify as to certain transactions between the witness and the defendant at the house where she and

the defendant lived, "which took place a considerable time before the homicide, and from a mile to a mile and a half from the scene of the homicide." The evidence objected to was as follows: "At my house, before my brother was killed, Loyd came and he said, 'Open the door,' and he come on in with his shoes in his hands, and he asked me if supper was ready, and I told him yes. He said, was there any water? And I said I brought some about sundown. And he said he was going to the spring . . and come back and kill me, a son-of-a-bitch. At that time I was home in bed. Had pulled my clothes off. The door was buttoned. He had a knife in his hands. I was on the bed when he came in. He was on one side of the bed, and the shelf was on the other. The knife was open. He then left, and I went out of the back door to my mother's, about a mile." It is urged that this evidence was not relevant to the issues involved, was not material, and was not a part of the res gestæ, and that it was inadmissible also because these facts were not communicated to the deceased, who was a brother of the witness, and that it was calculated to prejudice the minds of the jury against the defendant, and was in no way connected with the homicide. This evidence was properly admitted for the consideration of the jury, as a part of the res gestæ, and as showing the state of mind of the defendant just prior to the homicide, and .as a part of the entire transaction; and the objections urged to it are not well founded. Other evidence in the record shows that almost immediately ·· after making these threats against the witness, who was a sister of the deceased, the defendant followed closely after her to the home of her mother and brother, whither she had fled for protection. On his arrival there, the defendant said (according to Sue Greer, who was the mother of the witness and who lived with the deceased), "I come to kill or get killed, or have Nigger [as he called witness's daughter] out of there." Laura Greer, the witness whose testimony is objected to, testified substantially to the same effect. Mr. Hugh Barnes, with whom Laura Greer, the witness, and the defendant lived, testified: "I think about a week before Good was killed, Loyd came up to my house one night, and I asked him where was Laura. He said they had a fuss, he jumped on her and beat her, but that he reckoned she would be back to cook supper. And I said, 'If she don't come back, will you go after her?' And he

said, 'I don't know, sir.' And I said, 'You had better stay away from over there.' And he said, 'If I ever do go after her and they don't let her come, I will kill somebody or get killed, one.' We were talking about her going to her mother's." These declarations show the state of mind of the defendant towards the witness Laura Greer, and also towards the members of her family, including the deceased, upon whom the witness had a right to rely for protection. The declaration complained of was uttered just long enough in point of time before the homicide to allow the defendant to go from the home of Laura Greer, where they were made, to the spring and from there to the home of the deceased, where the homicide occurred. It will thus be seen that the facts and circumstances attending the killing comprise one continuous transaction from the conversation with Laura at her home to the time of the homicide. In 6 Enc. of Evidence, 610 (b), it is said: "The difficulties between the defendant and third persons immediately preceding the homicidal act or assault, which are the cause or occasion of the fatal difficulty, form part of the res gestæ, but they must be immediately connected in some way with the homicide and tend to explain it." See also *Doyal* v. *State,* 70 *Ga.* 134, 146 (4); *Stiles* v. *State,* 57 *Ga.* 183; *Johnson* v. *State,* 88 *Ga.* 203 (14 S. E. 208); *Revel* v. *State,* 26 *Ga.* 276 (4). In the case of Thomas *v.* State, 44 Tex. Cr. App. 344 (72 S. W. 178), it was held: "Defendant, prosecuted for assault with intent to murder, had used threatening language to a third party and his companion, and even drawn a knife, because he was refused a bicycle. Prosecutor was not present at the time, and knew nothing of this altercation. A few minutes afterwards, at a place some distance therefrom, prosecutor joined the third party, and shortly thereafter they overtook defendant, who attacked the third party with rocks; and, in attempting to prevent this attack, prosecutor was stabbed. Held, that evidence of the original altercation was admissible as part of the res gestæ." In rendering the opinion in that case, Henderson, J., on p. 179, said: "It occurs to us that all of this testimony was admissible as a part of the res gestæ, although Beer knew nothing of it, but simply interfered to protect his friend from an assault, when he himself was set upon by appellant, and severely cut and wounded. The State had a right to this evidence, as showing the origin of the difficulty—the cause of the assault by appellant on Lee. It showed

appellant in the wrong from the start; and while the original trans-action was unknown to the prosecutor, Beer, what he did know and see when appellant assaulted the witness Lee authorized him to interfere. What had transpired before showed the animus which actuated appellant, not only with reference to Lee, but with refer-ence to any one else who might interfere to prevent him from as-saulting Lee. This was a continuous difficulty, and it was compe-tent for the State to show how it began." See also *Rawlings* v. *State,* 124 *Ga.* 31, 57 (52 S. E. 1). "Every fact or circumstance shedding light upon the transaction should go to the jury, and especially such facts as show motive for the crime or the intent with which it was committed." *Doyal* v. *State,* 70 *Ga.* 146. And see *Hunter* v. *State,* 43 *Ga.* 484.

2. Error is assigned on admitting in evidence, over objection of the defendant, the following testimony of Hugh Barnes: "I think about a week before Good was killed, Loyd came up to my house one night, and I asked him where was Laura. He said they had a fuss, he jumped on her and beat her, but that he reckoned she would be back to cook supper. And I said, 'If she don't come back, will you go after her?' And he said, 'I don't know, sir.' And I said, 'You had better stay away from over there.' And he said, 'If ever I do go after her and they don't let her come, I will kill somebody or get killed, one.'" Under the ruling made in the case of *Harris* v. *State,* 109 *Ga.* 280 (34 S. E. 583), this testimony was clearly admissible. In that case (p. 281) Mr. Justice Cobb said: "Complaint is made in the motion for a new trial that the court erred in not ruling out the testimony of a witness for the State, to the effect that he saw the accused, the night the dance took place, about three hundred yards from the house where the dance was held and about thirty minutes before the homicide took place; that when witness met him he had a pistol in his hand; that he was laughing and going on, and said 'he was going to get him a man.' Objection was also made to similar testimony of another witness; this witness stating that the accused said to him, on the day before the homicide occurred, that he 'was gwine over to the dance and get him a negro.' Objection was made to the testimony of these two witnesses, on the ground that the language used by the accused was irrelevant, as it was not directed against any particular person, and the statement made to the witness first

above referred to was made in a jocular and not in a vindictive manner. We do not think there was any error in refusing to rule out this testimony. What weight it was entitled to was a question entirely for the jury. It was certainly capable of being understood as conveying a threat to kill some person who was expected to be present at the dance on the night the homicide took place. The statement that a negro had taken his woman, that he was going to the dance to get him a negro, coupled with the fact that he was present at the dance, that he shot and killed a negro about a woman, would indicate that the declarations made had some connection with the homicide charged against him." See also *Hixon v. State,* 130 *Ga.* 479 (3), 482 (61 S. E. 14). It will be noted that the language imputed to the defendant in the present case was, "If ever I do go after her and they don't let her come, I will kill somebody or get killed, one." He did go after her, according to the undisputed testimony, on the night of the fatal rencounter, and her brother, who was acting as her protector, did object to his coming into the house after her, and the accused did kill the brother   The evidence was clearly admissible, and it was for the jury to say what weight they would give it. It might well be understood as conveying a threat that if any one "over there" at her brother's house didn't let her come with the defendant when he went after her, he would kill them.

3.   Complaint is made of the following charge of the court: "The court charges you in this connection, under the laws of the State of Georgia, that the deceased in this case had a right to protect his sister from any assault or from any personal assault on the part of the defendant, toward his sister; but as to whether or not the defendant was attempting to make an assault on deceased's sister is entirely a question of fact for you to settle." The error assigned is, that there was no evidence upon which to base the charge; that there was no assault made by the defendant upon the sister of the deceased, or any other person, at the house where the homicide occurred. We think there is evidence in the record to authorize the charge. One of the witnesses for the State testified: "The first thing that attracted my attention was Laura hollering when she came up. My son opened the door, and she came in saying, 'Don't let him kill me, Lordie, Buddie.' At that time Loyd was coming. She came in the house, and it was no time till

he came. I was lying down when Loyd first came up, and he said 'I come to kill or get killed, or have Nigger out of there.' I told him, 'Loyd, you are not obliged to come here that way.'" This language manifestly meant that the defendant would take the sister of the deceased at the cost of his own life, or else that he would kill some one in the house where the homicide occurred. An assault is defined to be "an attempt to commit a violent injury on the person of another. Penal Code, § 95. The brother had the right to protect his sister, and from the language of the defendant had a right to infer that he would carry into execution his threat to assault his sister or take the life of some one in the house, and to do whatever was necessary to prevent it. The judge properly left it to the jury to say, under the evidence, whether the defendant was making an assault on the sister of the deceased.

4. In the 7th ground of the amendment to the motion for a new trial error is assigned because the court, in the charge to the jury, stated that the defendant only contended that he was justified in his actions connected with the homicide, while in point of fact his contention was that under the State's evidence he was justified in slaying the deceased under the circumstances shown by it; and that in no event could the defendant be guilty of a greater offense than that of voluntary manslaughter, under the evidence. As to the latter contention, it is sufficient to say that this court held, when the case was here before (*Helms* v. *State,* 136 *Ga.* 800, 72 S. E. 246), that "the evidence did not authorize an instruction on the law of voluntary manslaughter," and the evidence on the former trial was substantially the same as that contained in the record now before us. We do not think the evidence in the present case authorized the court, in stating the contentions of the defendant, to embrace the insistence that the defendant could be guilty of no greater offense than manslaughter. We think, by reference to the judge's charge, it will be seen that he stated the contentions of the defendant fairly, under the evidence in this case. After stating the contentions of the State, among other things he said: "The defendant, on the other hand, contends that he is not guilty of any offense." Surely this is broad enough to cover voluntary manslaughter, as well as murder, and the defendant can not complain of the charge for the reason he has assigned.

5. The court gave the following charge to the jury: "If, after

investigating all the facts and circumstances in this case, you are satisfied by the preponderance of testimony in the case, or if you have a reasonable doubt on that question, that the defendant was acting in self-defense, or against one who was manifestly intending by violence or surprise to commit a felony on his person, the defendant would be justifiable." It is complained that this charge of the court was error. Undoubtedly it was inaccurate to charge the jury. as to the preponderance of testimony in a criminal case; but when the charge of the court is taken as a whole, it will appear that the error complained of is harmless, because the jury were instructed that they would not be authorized to convict the defendant unless they were satisfied of his guilt beyond a reasonable doubt, and this latter instruction was repeated several times. *Pressley* v. *State*, 132 *Ga.* 64 (8), 65 (63 S. E. 784) ; *Gale* v. *State*, 135 *Ga.* 351 (5), 356 (69 S. E. 537).

6. Complaint is made of the following charge, on the ground that it puts the burden on the defendant to satisfy the jury that his defense was good, while the law places it on the State to establish the guilt of the accused beyond a reasonable doubt: "But you would have to be satisfied that he was acting in self-defense, that is, in a bona fide effort to protect his person against one who manifestly intended by violence or surprise to commit a felony on his person, and was acting under an honest purpose to protect himself against one who was endeavoring to commit a felony on his person." The charge complained of is not altogether accurate, but, taken in connection with the entire charge, we do not see how it could harm the defendant. The court had fully and repeatedly instructed the jury that the burden was on the State to prove each and every material allegation contained in the indictment, beyond a reasonable doubt, before the defendant could be convicted, and we do not think that a reasonable construction of the charge, when taken as a whole, would mean, as contended, that the burden was upon the defendant to prove his defense by a preponderance of the testimony beyond a reasonable doubt. See *Gale* v. *State*, supra.

7. The last special assignment of error excepts to the failure of the court to define the term "felony." It is insisted that this should have been done, so that the jury could have known and determined whether or not a "felony" was about to be committed

53

by the deceased. It does not appear that any written request was made to define the term "felony." It was held in the case of *Pickens* v. *State,* 132 *Ga.* 46 (63 S. E. 783), that "The failure of the court to give in charge the legal definition of the term 'felony' appearing in Penal Code, § 70, which section was given in charge, was not such error as requires a new trial." See also *Worley* v. *State,* 136 *Ga.* 231 (71 S. E. 153); *Scott* v. *State,* 137 *Ga.* 337 (73 S. E. 575).

8. The verdict is supported by the evidence.

*Judgment affirmed. All the Justices concur.*